## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

**CHRIS LEVERT SANFORD**
    **DEBTOR**

**CASE NO.: 04-13648**

**CHAPTER 7**

**GUARANTY BANK & TRUST CO.**
    **PLAINTIFF**

**ADV. NO.: 06-1020**

**VERSUS**

**CHRIS LEVERT SANFORD**
    **DEFENDANT**

### MEMORANDUM OPINION

Guaranty Bank & Trust Co. ("Guaranty") filed a complaint against debtor Chris Levert Sanford ("Sanford") alleging that Sanford's debt to Guaranty is not dischargeable under 11 U.S.C §§523(a)(2), (3), (4) and (6).  The bank also objected to Sanford's discharge under 11 U.S.C. §§727(a)(2), (3) and (6).[1]  This memorandum opinion explains why Sanford's debts to Guaranty are nondischargeable under 11 U.S.C. §523(a)(6) and Sanford's discharge is denied under 11 U.S.C. §§727(a)(2)(A), (a)(3), and (a)(6)(A).

### FACTS

For several years before Sanford's 2004 bankruptcy filing, the debtor made his living managing and trading cattle.  Sanford borrowed a total of $282,722.00 in three loans from Guaranty to finance his cattle operations.[2]  Sanford's livestock, vehicles, equipment and house

---

[1]  Guaranty also may have objected to Sanford's discharge under 11 U.S.C. § 727(a)(5), but citations to section 727(a) in its complaint were confusing.  *See* Pl.'s Compl. at ¶¶ XII and XI.  In any case, the court declines to address whatever those claims may have been given its ruling on the less ambiguous allegations.

[2]  Pl.'s Exs. 4, 10 and 16.  Sanford owed Guaranty a total debt of $252,783.59 at the time Sanford filed his original bankruptcy petition.  Pl.'s Ex. 36 Guaranty's Proof of Claim filed March 22, 2005.  This total represents combined $251,353.59 in unpaid principal and pre-petition interest on the three loans, plus pre-petition attorney's fees in the amount of $650.00 and costs in the amount of $780.00 in connection with Guaranty's collection efforts.

and surrounding acreage were collateral for the loans.[3]  The debtor's alleged liquidation of the

bank's collateral in the year before his bankruptcy is the focus of this adversary proceeding.

### The First Loan

Sanford's relationship with Guaranty began in late 2001.  Before the bank made what

would be the first of three loans to the debtor, Guaranty's vice president and chief loan officer,

Mark Major ("Major"), obtained the debtor's financial statement from the Bank of Jackson.[4]  The

financial statement reflected that Sanford owned 350 cows worth $265,000, four horses valued at

$6,000, and 13 bulls worth $19,500.[5]  Sanford also signed a Guaranty commercial loan

application stating that he owned cattle worth $253,500 and equipment valued at $29,500.[6]

On December 7, 2001, before the bank funded the initial loan, Major inspected the

collateral.  Major noted that Sanford then owned about 350 cattle and 13 bulls.[7]  The bank made

its first loan to Sanford on March 15, 2002.  The $260,000 loan was payable in seven annual

$51,000 installments, the first of which was due in December 2002.  Six months after the bank

made the loan, Major again inspected the collateral and "pretty much saw the whole herd."[8]

Guaranty gave Sanford two extensions to make loan payments.  Before the first payment

even came due in December 2002, the bank gave Sanford an extension to make his initial loan

payment.  The extension to April 2003 allowed time for Sanford's cattle to gain weight in order

---

[3]  Pretrial Order at 1-2.

[4]  Sanford repeatedly stated that he did not sign or date the financial statement from the Bank of Jackson. Trial Tr. at 89.  Major testified that Sanford gave the financial statement to him in order to obtain the first loan.  Trial Tr. at 6.

[5]  Pl.'s Ex. 1.

[6]  Pl.'s Ex. 2.

[7]  Pl.'s Ex. 40 *in globo*.

[8]  Trial Tr. at 14; Pl.'s Ex. 40 *in globo*.

to bring a better sale price.[9]  Major approved the extension because the bank often gave its

cattlemen customers extensions for that purpose.[10]  Sanford eventually paid the first installment

in June 2003.[11]  The bank extended the due date on Sanford's second installment payment as

well.  Despite that, in June 2004 Sanford only partially paid the second installment.

### The Second Loan

Guaranty loaned Sanford $12,230 to buy a tractor on September 4, 2003.  The loan was

secured by the tractor and cross collateralized by Sanford's cattle and equipment.  In connection

with the second loan, Sanford signed a commercial security agreement in which he claimed to

have 400 mixed beef cows valued at $280,000, 20 registered bulls worth $30,000, and 320 calves

worth $122,000.[12]  Sanford also represented that he owned equipment worth $25,075.[13]  On the

same day the bank funded the tractor loan, Major tried to inspect the other collateral for its loans,

with limited success.[14]  Major testified that Sanford assured him that 60 cows were not visible

from Major's vantage point because of rain and impassable roads, and said that 50 other cows

were not readily visible because they had wandered on to a neighbor's wooded property.[15]

### The Third Loan

The bank made a third loan to Sanford on February 6, 2004.  Sanford submitted a

commercial loan application for this $11,412 loan, which was to finance earth moving work for a

---

[9]  Trial Tr. at 14-15.

[10]  Trial Tr. at 52-54.

[11]  Trial Tr. at 53.

[12]  Pretrial Order at 2.

[13]  Pl.'s Ex. 9.

[14]  Trial Tr. at 16; Pl.'s Ex. 40 *in globo*.

[15]  Trial Tr. at 16; Pl.'s Ex. 40 *in globo*.

real estate development near St. Francisville.[16]  As collateral, Sanford pledged in the application

a "lien on cattle valued at $310,000."[17]  The evidence does not show that Sanford ever paid any

part of the third loan.

### Disposition of the Bank's Collateral and Proceeds

Sanford filed for bankruptcy relief on November 4, 2004.  The debtor's response to

question 10 on the statement of financial affairs filed December 2, 2004 did not reflect the sale of

any collateral during the year before his bankruptcy.[18]  Sanford amended his statement of

financial affairs on February 23, 2005 to disclose that he had sold, traded and exchanged

livestock that was subject to Guaranty's liens.[19]  His amended statement of financial affairs

indicated that his tax returns reflected the livestock purchasers, and sale prices and dates.

However, Sanford's tax returns did not provide any of that information.  Furthermore, according

to Sanford's schedules, on the day he filed bankruptcy he owned only one horse, two bulls and

equipment worth $20,000.[20]  Thus, Sanford's schedules and amended statement of financial

affairs paint a financial picture far different from that depicted by the financial statement he

presented to Guaranty to obtain the loans.

Sanford did not explain the disposition of the collateral or the collateral sales proceeds

during an examination pursuant to FED. R. BANKR. P. 2004, at his meeting of creditors, or in his

trial testimony.  Instead, the debtor repeatedly attempted to refer to his accountant all questions

---

[16]   Sanford's lease of a bulldozer for this project was the subject of the court's January 31, 2005 memorandum
opinion.  *In re Sanford*, 2005 WL 629022 (Bankr. M.D. La. 2005).

[17]   Pl.'s Ex. 14.

[18]   Pl.'s Ex. 30.

[19]   Pl.'s Ex. 34.

[20]   Pretrial Order at 2-3.

concerning the collateral and its proceeds.[21]  Sanford could not explain what happened to the

collateral even after referring to his own undated handwritten notes,[22] spreadsheets[23] and cattle

sales receipts.[24]  According to Sanford, he could reconstruct his financial affairs, but it "would

take a long time."[25]

Sanford also maintained that Guaranty agreed to his disposition of the cattle without

paying the proceeds to Guaranty.[26]  He explained that by letting him borrow more money,

Guaranty essentially agreed to his sale or trade of cattle without giving the bank the proceeds.[27]

Sanford testified that he used proceeds of cattle sales to buy new cattle and equipment, to pay

$96,000 to Guaranty, and to put $200,000 to $300,000 into his construction company.[28]

The day Sanford filed his original bankruptcy petition, he owed the bank a total debt of

$252,783.59.[29]  According to Major, there was adequate collateral to pay off the entire debt had

Sanford turned over the collateral proceeds to Guaranty.[30]

---

[21]  Pl.'s Ex. 29 Transcript of December 2, 2004 FRBP 2004 Examination at 16; Pl.'s Ex. 39 Transcript of December 29, 2005 meeting of creditors at 28; Trial Tr. at 112-13, 116.

[22]  Trial Tr. at 116.  Sanford's handwritten field notes are Def.'s Ex. 17.

[23]  Def.'s Ex. 4.

[24]  Def.'s Ex. 14.  Most of these receipts pre-date the bank's first loan in March 2002.

[25]  Trial Tr. at 145.

[26]  Trial Tr. at 125.

[27]  Trial Tr. at 126.

[28]  Trial Tr. at 127.

[29]  See footnote 2, above.

[30]  Trial Tr. at 26.

# LAW AND ANALYSIS

## I.  DISCHARGEABILITY OF PARTICULAR DEBTS

Guaranty as the plaintiff bears the burden of proving by a preponderance of the evidence the elements of an objection to the dischargeability of a particular debt under 11 U.S.C. §523. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991); *Matter of Fields*, 926 F.2d 501, 503 (5th Cir. 1991), citing *In re Benich,* 811 F.2d 943 (5th Cir. 1987).

### A.  Guaranty failed to demonstrate that Sanford misrepresented his financial condition.

Section 523(a)(2) provides in relevant part that a discharge under 11 U.S.C. §727 does not relieve an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's [ ] financial condition; or
>
> (B) use of a statement in writing –
>
> > (i) that is materially false;
> >
> > (ii) respecting the debtor's [ ] financial condition;
> >
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> >
> > (iv) that the debtor caused to be made or published with intent to deceive.

Paragraphs (A) and (B) necessarily require a falsity.  In other words, the party objecting to dischargeability of a particular debt must demonstrate a difference between the debtor's professed financial condition and his true financial condition.  *See Matter of Quinlivan*, 434 F.3d 314, 317 (5th Cir. 2005) (section 523(a)(2) requires proof that the debtor made representations

knowing they were false at the time they were made).  A financial statement must be false when
it is submitted.  *See In re Lefeve*, 131 B.R. 588 (Bankr. S.D. Miss. 1991) (debtor's financial
statement showed assets in which debtor had no interest at the time of submission).  Guaranty
did not demonstrate that any of Sanford's financial statements were false.

Major testified that in December 2001, before the bank made the first loan, he personally
inspected property Sanford intended to give the bank as collateral.  Major's notes regarding the
December 2001 inspection correspond with the financial statement Sanford had given to the
Bank of Jackson, and which the debtor caused to be sent to Guaranty.  Major also testified that
when he conducted a second inspection of the collateral in June 2002, he "pretty much saw the
whole herd that [Sanford] had stated to me originally."[31]  Thus, Major's testimony and
corroborating documentation support a finding that Sanford did not misrepresent his financial
condition when the bank made the first loan.

Sanford's written application for the second loan represented the value of his cattle as
approximately $310,000, which corresponds with Major's notes from September 4, 2003.[32]  At
that inspection, after Major noticed that Sanford seemed to have fewer heads of cattle, Sanford
assured him that they were nearby.[33]  However, Guaranty produced no evidence contradicting
Sanford's account.  Thus, Guaranty failed to demonstrate that either the written statements
Sanford submitted to obtain the second loan, or Stanford's oral representations about the cattle,
were false when they were made.

---

[31]  Trial Tr. at 14.

[32]  Pl.'s Ex. 40.  Major's notes state that Sanford told Major the cattle was worth $310,000.

[33]  Pl.'s Ex. 40.  Major's notes from the September 4, 2003 inspection reflect that he could not see 60 cows because
it was raining and the road was impassable.  Major also noted that, according to Sanford, he could not see another 50
head of cattle that had wandered onto a neighbor's woodland through a hole in the fence.

Finally, Guaranty produced insufficient evidence concerning Sanford's financial condition to support a finding that Sanford falsely represented his financial condition to the bank when it made the third loan on February 6, 2004.  The record plainly shows that Sanford liquidated the collateral during the period between Major's September 4, 2003 inspection of the collateral and Sanford's November 4, 2004 bankruptcy petition.  Although, Sanford testified at trial that he did not own cattle worth $310,000 on the date of the third loan, this testimony, by itself, does not support a conclusion that Sanford's commercial loan application was materially false.  Sanford's testimony was not an unqualified admission.  He explained that "[he] had a lien on cattle that was worth [] $310,000."[34]  According to Sanford's interpretation of the commercial loan application, the application did not say he owned the cattle, rather, it said there was a lien against his cattle worth $310,000.[35]  As implausible as the debtor's trial testimony was, on the record before it, the court cannot conclude that Sanford misrepresented his financial condition when he made the third loan on February 6, 2004.

Guaranty has failed to prove by a preponderance of the evidence that Sanford's debt to it is not dischargeable under Bankruptcy Code section 523(a)(2).

**B.  *Sanford was not acting in a fiduciary capacity, and Guaranty did not prove that the debtor committed embezzlement or larceny.***

Section 523(a)(4) excepts from discharge debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.  The agricultural security agreements between Sanford and Guaranty provide that "[u]nless waived by [Guaranty], all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for [Guaranty]…."[36]

---

[34]   Trial Tr. at 97.

[35]   Trial Tr. at 97.

[36]   Pl.'s Ex. 5 at 2; Pl.'s Ex. 12 at 2; Pl.'s Ex. 17 at 1.

Guaranty relies on this language to support its argument that Sanford's debts are not dischargeable under 11 U.S.C. §523(a)(4).

### 1. __Sanford was not a fiduciary for the purposes of 11 U.S.C. §523(a)(4).__

For the purposes of section 523(a)(4), debt resulting from fraud or defalcation must be incurred while the debtor occupies a fiduciary capacity because the phrase "while acting in a fiduciary capacity" qualifies the words "from fraud or defalcation."  4 COLLIER ON BANKRUPTCY ¶523.10[2] (15th ed. rev. 2006).

In *In re Levitan*, 46 B.R. 380, 385 (Bankr. S.D.N.Y. 1985), the court wrote that "an agreement which is essentially a commercial security agreement in which the creditor has used trust language and imposed obligations on the debtor to secure repayment of the debt does not create the fiduciary relationship required by §523(a)(4)."  The *Levitan* court relied on *Davis v. Aetna Acceptance Corp.,* 293 U.S. 328 (1934), in which the Supreme Court narrowed the scope of the term *fiduciary* and ruled that security agreements using trust language and imposing trust-like duties on the debtor do not necessarily create the requisite fiduciary relationship for purposes of dischargeability.  *See also In re Harrell*, 94 B.R. 86, 90 (Bankr. W.D. Tex. 1988) (citing *Levitan* in concluding that a security agreement did not give rise to a fiduciary relationship for purposes of section 523(a)(4)).  The reasoning of these decisions is persuasive.

Moreover, the parties must intend to create a trust relationship.  *In re Rea*, 245 B.R. 77, 87 (Bankr. N.D. Tex. 2000), citing *In re Chavez*, 140 B.R. 413, 423 (Bankr. W.D. Tex. 1992). Even if the security agreements could supporting a conclusion that Sanford was Guaranty's fiduciary, the bank offered no evidence to support a finding that Sanford and Guaranty ever intended or considered their relationship to be anything other than that of a creditor and its debtor.

The evidence and law support the conclusion that the security agreements between Guaranty and Sanford did not create a fiduciary relationship within the meaning of Bankruptcy Code section 523(a)(4).  Accordingly, Sanford was not the bank's fiduciary for purposes of Bankruptcy Code section 523(a)(4).

### 2.  Guaranty did not allege or prove that Sanford committed larceny or embezzlement.

The phrase "while acting in a fiduciary capacity" in 11 U.S.C. §523(a)(4) does *not* qualify the words "embezzlement" or "larceny."  4 COLLIER at ¶ 523.10[2].  However, Guaranty offered no proof that Sanford committed larceny or embezzlement, and so is not entitled to judgment on that basis.[37]

### C.  *Sanford willfully and maliciously injured Guaranty by converting the bank's collateral.*

Guaranty's final objection to dischargeability is based on 11 U.S.C. §523(a)(6), which excepts from discharge debts for a debtor's willful and malicious injury to another entity or to the property of another entity.

The Fifth Circuit articulated the standard for applying section 523(a)(6) in *In re Miller,* 156 F.3d 598 (5th Cir. 1998), holding that an injury is "willful and malicious" where the debtor's conduct would cause injury according to an objective substantial certainty of harm standard or upon a showing that the debtor had a subjective motive to cause harm.  *Accord, In re Rice*, 308 B.R. 759, 762 (Bankr. N.D. Miss. 2004), citing *Miller*, 156 F.3d at 606.

The act of selling collateral can result in a willful and malicious injury.  *Bd. of Regents v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998), citing *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S. Ct.

---

[37]  *See also* Pl.'s Compl. (no allegation that Sanford committed larceny or embezzlement within the meaning of section 523(a)(4)); Pl.'s Pretrial Mem. & Pl.'s Post Trial Mem. (no argument concerning the larceny and embezzlement exceptions to discharge under section 523(a)(4)).

38, 61 L. Ed. 205 (1916).  *See also Kawaauhau v. Geiger*, 523 U.S. 57, 63, 118 S. Ct. 974,

978 (1998) (reaffirming *McIntyre*).  Accordingly, unless a creditor can prove not only that a

debtor knew of the creditor's security interest in the collateral, but also that the debtor intended to

cause financial harm in disposing of collateral or that the disposition was substantially certain to

result in financial harm to the creditor, the debt cannot be declared nondischargeable.

The evidence does not support a finding that Sanford subjectively intended to cause

Guaranty financial harm, but it does support a finding that the debtor's acts were objectively

substantially certain to result in substantial harm to Guaranty.  Sanford disposed of the collateral

despite his knowledge of Guaranty's rights in that collateral.[38]  Sanford never accounted for the

bank's collateral or its proceeds, nor did his amended statement of financial affairs explain the

disposition of the collateral.[39]  Specifically, the debtor's answered Question 10 on the amended

statement of financial affairs[40] by stating that between 2002 and 2004, he sold, traded and

exchanged livestock subject to Guaranty's lien rights.  It further stated that some cows died and

others were poisoned.  Sanford's answer does not state the value he received for the collateral, or

identify the purchasers.  Instead, the answer references the debtor's tax returns,[41] which also fail

to identify buyers and the amount they paid Sanford for the cattle.

During his trial testimony, Sanford never explained the fate of the collateral.  He testified

at trial that he did not know how many head of cattle he sold in 2004;[42] to whom he had sold the

---

[38]  Trial Tr. at 101.  Sanford testified that he absolutely understood the meaning of the term *cross-collateralization*.

[39]  Pl.'s Ex. 34.

[40]  Question 10 on the Official Form 7 - Statement of Financial Affairs requires a debtor to identify every transfer of
property within the one year period preceding the commencement of the bankruptcy case, as well as the transferee
and the consideration for the transfer.

[41]  *See* Pl.'s Ex. 20-23.

[42]  Trial Tr. at 112.

cattle;[43] or whether he had sold the cattle by July 2004.[44]  Even Sanford's handwritten notes did not help him answer questions on those subjects.[45]

Sanford admitted that Guaranty never expressly consented to his sale of all its collateral. Nevertheless, the debtor argued that Guaranty tacitly approved the disposition of the collateral by extending him the second loan.[46]  The record does not support that argument.

On all these subjects, Sanford's trial testimony was evasive, and not credible.

A debtor that uses collateral sales proceeds to cover operating expenses and to replenish the collateral with the approval of the secured creditor does not commit a violation of 11 U.S.C. §523(a)(6).  *In re Grisham*, 245 B.R. 65, 73-74 (Bankr. N.D. TX. 2000).  Major testified that Guaranty did not object to Sanford's sale of the cattle and use of the proceeds to pay costs and to replenish the herd.[47]  However, the evidence established that Sanford went far beyond this.  He liquidated all of the collateral by the time of his bankruptcy filing and did not apply the proceeds to expenses, new cattle or his debt to Guaranty.  This rendered his debt to the bank nondischargeable under 11 U.S.C. §523(a)(6).

Unfortunately, Guaranty never offered an accounting of its claim as of the date of trial. Its proof of claim was admitted into evidence,[48] and established a total debt of $252,783.59[49] on

---

[43]  Trial Tr. at 123.

[44]  Trial Tr. at 120.

[45]  Trial Tr. at 116.  Sanford's handwritten notes are Def.'s Ex. 17.  Sanford testified that he could reconstruct his sales records, but that "it would take a long time."  Trial Tr. at 145.

[46]  Trial Tr. at 126.

[47]  Major testified that the proceeds from the sale of cull cows are "either applied to the loan, the principal, or the proceeds are used to replace the cows, or purchase younger heifers."  Trial Tr. at 13.

[48]  Pl.'s Ex. 36 Guaranty's Proof of Claim filed March 22, 2005.

November 2, 2004, the date Sanford filed his petition. However, Guaranty offered absolutely no evidence of the actual amount due on the day it filed its complaint,[50] or as of the date of trial.[51] The record does not contain enough evidence from which the bank's debt can be calculated, because the bank's proof of claim does not specify the principal balance on each of the three promissory notes, which carry different interest rates. As a result, the court fixes Guaranty's nondischargeable debt as $252,783.59.

## II. OBJECTIONS TO DISCHARGE

Guaranty also objected to Sanford's discharge under 11 U.S.C. §727, which directs bankruptcy courts to discharge chapter 7 debtors absent proof of a specific ground for denial of discharge. 6 COLLIER ON BANKRUPTCY ¶727.01[1] (15th ed. rev.) Guaranty as objector has the burden of proving by a preponderance of the evidence a ground for objection to discharge. FED. R. BANKR. P. 4005; *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992), citing *Grogan,* 498 U.S. at 287-88.

### A. *Sanford intended to hinder and delay Guaranty.*

Guaranty first objects to Sanford's discharge under section 727(a)(2)(A), which provides that:

> (a) The court shall grant the debtor a discharge, unless-
>
> > (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--

---

[49]   This total represents combined $251,353.59 in unpaid principal and pre-petition interest on the three loans, plus pre-petition attorney's fees in the amount of $650.00 and costs in the amount of $780.00 in connection with Guaranty's collection efforts. *See* Pl.'s Ex. 36 Guaranty's Proof of Claim filed March 22, 2005 at ¶4.

[50]   Guaranty filed its complaint on February 28, 2006.

[51]   The trial date was September 6, 2006.

(A) property of the debtor, within one year before
the date of the filing of the petition . . . .

A creditor must prove four elements to support denial of discharge under section

727(a)(2)(A): 1) a transfer or concealment of property; 2) belonging to the debtor; 3) within one

year of the filing of the petition; and 4) with intent to hinder, delay, or defraud a creditor or

officer of the estate. *In re Pratt*, 411 F.3d 561, 565 (5th Cir. 2005), citing *Matter of Chastant,*

873 F.2d 89, 90 (5th Cir. 1989).

Section 727(a) must be construed liberally in favor of Sanford and strictly against

Guaranty. *In re Guenther*, 333 B.R. 759, 763 (Bankr. N.D. Tex. 2005), citing *FDIC v. Sullivan*

*(In re Sullivan)*, 204 B.R. 919, 938 (Bankr. N.D. Tex. 1997). However, a discharge is not a

right, but a privilege granted only if a debtor has made a good faith effort to produce a complete

picture of his financial affairs. *Guenther*, 333 B.R. at 763, citing *Union Planters Bank, N.A. v.*

*Connors*, 283 F.3d 896, 901 (7th Cir. 2002).

The debtor's amended statement of financial affairs and financial statements, and the

testimony of Sanford and Major, establish that Sanford transferred Guaranty's collateral without

the bank's permission over the year before his bankruptcy.[52] The remaining issue is whether

Sanford intended to hinder, delay or defraud Guaranty in making those transfers.

Evidence of a debtor's actual intent to defraud creditors is essential to denying a

discharge. *In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983). However, intent to hinder or delay,

even if not fraudulent, is sufficient to trigger loss of a debtor's discharge under section 727(a)(2).

---

[52]   When Sanford filed bankruptcy on November 4, 2004, his schedules indicated that he had only one horse, two
bulls worth $1,000 and equipment worth $20,000. This picture is much different from the one he painted nine
months earlier. On February 6, 2004, Sanford executed a financial statement in order to obtain the third loan. This
financial statement indicated that he had nearly 400 head of cattle. The debtor also testified that on February 6,
2004, he owned "a couple hundred cattle." Trial Tr. at 98, line 15-16.

*In re Bowyer*, 916 F.2d 1056 (5th Cir. 1990) (*defraud* does not subsume *hinder* or *delay*); *In re*

*Morris*, 51 B.R. 462 (Bankr. E.D. Tenn. 1985) (language of section 727(a)(2) is disjunctive).

The evidence does not support a finding that Sanford intended to defraud Guaranty, but it

does establish that Sanford intended to hinder and delay Guaranty.  During the year preceding his

bankruptcy filing, Guaranty's Major began to have difficulty communicating with Sanford

concerning the collateral and performance of the debtor's loan agreement.[53]  Sanford was

reluctant to let Major inspect the collateral.  Major testified that he unsuccessfully attempted to

inspect the cattle at Sanford's ranch during this time.[54]  On September 4, 2004, Major was able to

observe the cattle, but only saw 70 of the herd.[55]  According to Major, Sanford cut short this

inspection because Sanford had an appointment in Baton Rouge.[56]

The evidence supports a finding that Sanford intended to hinder and delay Guaranty, and

as a result the court will deny Sanford's discharge.  11 U.S.C. §727(a)(2)(A).

### B.  *Sanford failed to maintain adequate records of his cattle business.*

Section 727(a)(3) bars a debtor's discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information ... from which the debtor's financial condition
> or business transactions might by ascertained, unless such act or failure to act was
> justified under all of the circumstances of the case. . . .

Guaranty as plaintiff bears the burden of proving that Sanford failed to keep and preserve

his financial records and that his failure prevented the bank from ascertaining Sanford's financial

---

[53]  Between June 2004 and September 2004, Major and the law firm of Jewel & Jewel, counsel for Guaranty, sent
Sanford several demand letters that went unanswered.  Trial Tr. at 19-22; Pl.'s Ex. 40 *in globo*.  Major placed several
telephone calls to Sanford about payment of the yearly installment on the first loan.  Trial Tr. at 20; Pl.'s Ex. 40 *in
globo*.  The record shows that Sanford only returned one of these calls.  Trial Tr. at 24.

[54]  Trial Tr. at 19-25.

[55]  Trial Tr. at 22; Pl. Ex. 40 *in globo*.

[56]  Trial Tr. at 22; Pl. Ex. 40 *in globo*.

condition.  *In re Dennis*, 330 F.3d 696, 703 (5th Cir. 2003).  A debtor's financial records need not

contain "full detail," but "there should be written evidence" of the debtor's financial condition.

*Dennis*, 330 F.3d at 703, citing *In re Goff*, 495 F.2d 199, 201 (5th Cir. 1974).

Sanford's cattle operation involved the yearly purchase and sale of cattle worth more than

three hundred thousand dollars.  The debtor testified that at any given time, he could have had a

net worth of two million dollars.[57]  Sanford's records were inadequate for that business.  *See In re*

*Keller*, 322 B.R. 127 (Bankr. E.D. Ark. 2005) (denial of discharge under section 727(a)(3)

appropriate where debtor's ranching operations involved yearly purchase and sale of cattle worth

around $3.7 million and debtor failed to keep general ledger, check register and deposit slips).

Once Guaranty carried its burden, Sanford was required to prove that the inadequacy in

his financial records was justified under all circumstances.  *Id.*, citing *In re Sadler*, 282 B.R. 254,

263 (Bankr. M.D. Fla. 2002); *In re Vitek*, 271 B.R. 551, 558 (Bankr. S.D. Ohio 2001).  Thus, to

avoid loss of his discharge Sanford was required to prove that he kept books and records in a

manner appropriate to his business and so as to reflect his financial condition with a fair degree

of accuracy.  *Union Planters Bank v. Connors*, 283 F.3d 896 (7th Cir. 2002).

Although Sanford offered into evidence numerous cattle sales records,[58] most of the

documents were dated between 1998 and late 2001, and therefore pre-dated the bank's first loan

in March 2002.  Moreover, Sanford's own "field notes" are not dated.[59]  Additionally, Sanford's

spreadsheets are incomplete: the debtor could not explain how the spreadsheets were prepared,

and did not call a witness who could explain them.[60]  Sanford attempted to deflect all

---

[57]  Pl.'s Ex. 29 Transcript of the December 2, 2004 FED. R. BANKR. PROC. 2004 Examination at 31.

[58]  Def.'s Ex. 14.

[59]  Def.'s Ex. 4.

[60]  Def.'s Ex. 16.

responsibility for maintaining his financial records upon his accountant, whom he did not call to

testify at trial.  Although at trial Sanford offered to reconstruct his records if given additional

time,[61] Sanford failed to use ample time before trial to do so.

The debtor failed to prove that the inadequacy in his financial records was justified under

all circumstances.  Accordingly, the court will deny Sanford's discharge under 11 U.S.C.

§727(a)(3).

### C. *Guaranty did not prove that Sanford's discharge must be denied under 11 U.S.C. §727(a)(4).*

Guaranty's next objection to discharge is under 11 U.S.C. §727(a)(4)(A),[62] which

deprives a debtor of a discharge if the debtor knowingly and fraudulently made a false oath or

account, in or in connection with the case. To prevail under section 727(a)(4)(A), the creditor

must prove: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor

knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the

statement related materially to the bankruptcy case.  *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir.

1992).  False oaths sufficient to justify the denial of discharge include "(1) a false statement or

omission in the debtor's schedules or (2) a false statement by the debtor at the examination

during the course of the proceedings."  *Id.*

Guaranty made only conclusory allegations that Sanford violated section 727(a)(4)(A).[63]

It did not produce any evidence that Sanford's statements were in fact false.  Therefore, the court

will dismiss the bank's demand to deny Sanford's discharge under section 727(a)(4)(A).

---

[61]   Trial Tr. at 145.

[62]   Section 727(a)(4) also provides for three other exceptions from discharge.  *See* 11 U.S.C. §727(a)(4)(B)-(D).
Because Guaranty's complaint does not allege sufficient facts to raise issues under section 727(a)(4)(B)-(D), the
court declines to address those issues.

[63]   *See e.g.* Pl.'s Compl. at ¶ XII; Pl.'s Post-Trial Mem. at 9.

***D.  Sanford's discharge is denied under 11 U.S.C. §727(a)(6)(A) because Sanford
failed to obey a lawful court order.***

Guaranty's final challenge to Sanford's discharge is based on 11 USC §727(a)(6)(A),
pursuant to which a debtor who disobeys a lawful court order may lose his discharge.[64]  This
count rests on Sanford's failure to obey the court's January 14, 2005 order directing him to appear
for examination pursuant to FED. R. BANKR. P. 2004 on January 18, 2005.

Under section 727(a)(6)(A), the objecting creditor bears the original burden of going
forward and the ultimate burden of proving that there has been a violation of a lawful order of
the court.  FED. R. BANKR. P. 4005.  Once the creditor meets its burden, the burden of going
forward shifts to the debtor, who must prove that he has not committed the objectionable act.  *In
re Beeber*, 239 B.R. 13, 30 (Bankr. E.D. N.Y. 1999), citing *Connelly v. Michael*, 424 F.2d 387,
389 (5th Cir. 1970).  Courts considering whether to deny a discharge under section 727(a)(6)(A)
take into account factors including the intent behind the debtor's acts: whether they were willful
or justifiably excusable; whether creditors were injured; and whether the bankrupt can make
amends for his conduct.  *Matter of Klein*, 1995 WL 656696, *3 (E.D. La.), citing *In re Kokoszka*,
479 F.2d 990, 998 (2d Cir. 1973), *aff'd*, 417 U.S. 642 (1974).

Sanford does not dispute that he failed to obey the order directing him to appear for an
examination, despite the court's denial of his counsel's request for a protective order delaying it.[65]
Sanford testified on cross-examination that his counsel told him not to appear for the
examination, but offered virtually no explanation why his counsel told him to skip the

---

[64]  Guaranty's complaint in the second paragraph identified as paragraph XI premised this demand on 11 U.S.C.
§523(a)(5), an obvious scrivener's error.  The debtor did not seek relief based on this error, and in any case the
bank's pre- and post-trial memoranda made plain that the bank had not abandoned this claim.

[65]  Guaranty's counsel eventually did examine the debtor.